Filed 9/4/25  P. v. Luna CA5
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>BRYAN LUNA,<br><br>    Defendant and Respondent.<br>_____<br><br>THE PEOPLE,<br><br>    Plaintiff and Appellant,<br>    v.<br><br>WILLIAM KENNETH WEBB,<br><br>    Defendant and Respondent. | F082309 & F082434<br>(Consolidated)<br><br>(Super. Ct. Nos. MCR066495A &<br>MCR066495B)<br><br><br>**OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Mitchell C. Rigby, Judge.

Rex Adam Williams, under appointment by the Court of Appeal, for Defendant and Appellant, Bryan Luna

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant, William Webb.

---

[*]    Before Levy, Acting P. J., Detjen, J. and Snauffer, J.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell and Kimberley A. Donohue, Assistant Attorneys General, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorney General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In 2020, appellants and defendants Bryan Luna (Luna) and William Webb (Webb), were convicted after a joint jury trial of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)), with enhancements that each personally inflicted great bodily injury on the victim in the commission of the assault (§ 12022.7, subd. (a)); the court found each defendant had one prior serious felony conviction enhancement (§ 667, subd. (a)).[2]

In 2021, both Luna and Webb were sentenced to 16 years in prison, based on the upper term of four years for assault with a deadly weapon, doubled to eight years as the second strike term, with consecutive terms of three years for the great bodily injury enhancement and five years for the serious felony enhancement.

In 2023, this court filed the nonpublished opinion in the consolidated appeal by Lund and Webb from their judgments, ordered correction of Webb's credits, and otherwise affirmed the judgments. In doing so, we agreed with defendants that the trial court did not impose the upper terms for assault with a deadly weapon in compliance with Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567). We noted that appellate courts were divided on the standard to assess prejudice in cases where the trial court imposed the upper term by relying on aggravating circumstances that were not admitted or found true beyond a reasonable doubt, and the question was pending before

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] As will be discussed below, codefendant Francisco Samaniego (Samaniego) was also arrested, charged, and convicted of assault with a deadly weapon in the same jury trial, but the jury did not reach a finding on the great bodily injury enhancement. Samaniego is not part of this appeal.

2.

the California Supreme Court. We concluded the trial court's errors in defendants' cases were not prejudicial because there was a reasonable probability that the jury would have found the aggravating circumstances were true beyond a reasonable doubt.

In 2023, the California Supreme Court granted the petition for review filed by Luna and Webb and deferred further action pending disposition of the related sentencing issue in *People v. Lynch* (S274942).

On June 11, 2025, the California Supreme Court transferred this matter back and directed this court to vacate our prior opinion and reconsider the cause in light of *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*) and *Erlinger v. United States* (2024) 602 U.S. 821 (*Erlinger*). As will be discussed below, *Lynch* relied on *Erlinger* and settled the division among the courts and held the standard of review, pursuant to *Chapman v. California* (1967) 386 U.S. 18, applies when the trial court relies on aggravating factors that were not properly proved under section 1170, subdivision (b), even if some other aggravating factors relied on by the trial court were correctly established. (*Lynch,* p. 768; see also *People v. Wiley* (2025) 17 Cal.5th 1069, 1086 (*Wiley*).)

On June 13, 2025, in accordance with the Supreme Court's order, we vacated our earlier decision, and the parties have submitted supplemental briefing.

In light of *Erlinger, Lynch, and Wiley*, the defendants and the People agree that remand for resentencing is required. We also agree. We affirm the convictions of Luna and Webb, vacate their sentences, and remand for resentencing consistent with Senate Bill 567's amendments to section 1170, subdivision (b).

## FACTS

Around 9:30 p.m. on May 28, 2020, 62-year-old Kevin Goodrich (Goodrich) was sitting at a table in the picnic pavilion area at Millview Park in Madera and getting ready to "bed down" for the night. Goodrich was homeless and had been living at the park by himself for four to six weeks. The pavilion area was very dark, and there were only lights in the adjacent parking lot.

Goodrich carried camping gear with him that consisted of a tent, sleeping bag, portable burner, and cooking utensils. He also had a backpack with his personal belongings and rode a red, 18-speed bicycle. Goodrich carried a knife to protect himself on the streets. On that night, he decided not to set up his tent, and instead placed his sleeping bag on top of a picnic table to sleep there.

## I. Goodrich Encounters Defendants.

Goodrich testified that Bryan "Polo" Luna, William "Will" Webb, and Francisco "Franky" Samaniego were also in the picnic area that night. They were sitting two tables away from him, about 15 to 18 feet away.

Goodrich had known Webb for over a year through the rescue mission. Luna occasionally stayed at the park, and Luna had introduced Goodrich to Samaniego. Goodrich testified that the three defendants talked among themselves, and he was not listening to their conversation.

Luna walked over to Goodrich and started to "bait" him. Luna said he did not want Goodrich to know about his business and what he was doing, he did not trust him, and he wanted Goodrich to leave. Goodrich testified that Luna sold drugs, and Luna said that he was afraid Goodrich was talking to the police. Luna said that if Goodrich did not leave, "they were going to beat me up and steal my bike and my stuff."

Goodrich testified that Luna was standing about 10 feet in front of him when he made these statements. Webb and Samaniego were about 12 feet behind Goodrich, and they moved closer to him. Goodrich did not see defendants in possession of any weapons at that time.

Goodrich testified that he pulled his folding knife from his pocket, opened the blade, and held it in his right hand because Luna was threatening him. Goodrich testified that he did not leave the picnic area because he had already set up his belongings for the night, and he wanted to stay there and defend his position.

Goodrich stepped forward, waved his knife at Luna, and thrust it forward. Luna backed away and continued to "bait" him, saying that Goodrich was too old and slow to

catch him. Goodrich testified that he was not looking for a fight, but he was going to defend himself and hoped Luna would leave. Luna moved too far away for Goodrich to hit him, or he might have made a second thrust of the knife toward Luna. Webb and Samaniego did not say anything to him.

As Goodrich stepped toward Luna, Samaniego took Goodrich's bicycle and pushed it behind some shrubs, about 18 to 20 feet away. Goodrich told Luna he was not going to leave, and Luna could just as easily leave himself.

Goodrich testified that after moving the bicycle, Samaniego returned to the area where Goodrich was standing with Luna and Webb. Samaniego was carrying three construction tools: a metal shovel with a round-nosed spade, a steel axe, and a sledgehammer, all of which had long wooden handles. Samaniego kept the sledgehammer and gave the shovel to Webb and the axe to Luna.

## II. The Assault.

Goodrich testified that Luna, Webb, and Samaniego "converged" on him, and started "swinging" at him with the weapons they were holding. No one else was in the picnic area when defendants attacked him. Goodrich grabbed his backpack and folded tent in his left hand and used them as shields. He still held his knife in his right hand. Goodrich had to "dance" and "wheel around" because the three defendants surrounded him with their weapons.

Goodrich tried to lunge at defendants with his knife, but they were able to stay away from him, and they attacked him with their long-handled tools. Goodrich did not believe he hit anyone with his knife.

## III. Goodrich's Testimony About Defendants' Blows

On direct examination, Goodrich testified that he was "getting hit" by all three defendants, but "to say who with what weapon at what time hit me, I mean, I can't tell that."

"Q     Mr. Luna, did he have a weapon?

"A     Yes. He had the long-handled axe.

5.

"Q    And did he swing it at you?

"A    Yes.

"Q    And did he ever strike you?

"A    Could be. I can't tell you which weapon, you know, did what. I mean, sometimes I had my pack up. And, you know, their long-handled tools, they were coming over the top, you know? It was a [melee]. I can't say … which injury was caused by what weapon.

"Q    So just to clarify, you are sure that Defendant Luna had a weapon and swung it at you, but you weren't sure if that was one of the ones that you were able to successfully block or if it's one of the one you weren't able to block and it did strike you; is that accurate?

"A    Yes.…"

Goodrich testified that Webb had the shovel and was swinging it.

"Q    And do you know whether or not [Webb] was successful in landing any of his strikes against you?

"A    I would imagine. He had the longest weapon. He had the longest reach. But, you know, it was – like I say, it was – I was having to wheel around and watch everybody and try to fend off whatever blows I could."

Goodrich testified that Samaniego had the sledgehammer, used it against him, and was "swinging it over his head."

"Q    And can you tell us whether or not [Samaniego] was successful in actually landing a strike on you?

"A    I can't say which one, you know … who landed what, you know, what caused what wound. I don't know. I had abrasions on my body and got my skull cracked and my face broken and my nose broken."

On further direct examination, Goodrich testified that all three defendants were swinging the tools "mostly" at his head and upper body. While he was not sure which defendant inflicted which injuries, he was sure that he was hit in the face and head multiple times, and "they were all swinging at me."

"Q    ... As to Defendant Luna, can you say with any certainty that you are sure he actually landed any of the blows he attempted on you?

"A    Oh, yes.

6.

"Q      And to what level of certainty are you sure that he indeed successfully struck you with his weapon?

"A      Oh, you mean to put a number on it?

"Q      How sure are you?

"A      Oh, I know he did.  I can't necessarily say exactly how many.

"Q      Can you estimate … how many times you are 100 percent sure that Luna struck you?  [¶] … [¶]

"[A]    At least two."

Goodrich was asked the same questions about Webb and testified that he was sure Webb actually landed blows on him.

"Q      And how many of [Webb's] attempted blows are you 100 percent sure landed?

"A      At least two.

"Q      And –

"A      I know it – well, probably more, but at least two, yes."

As to Samaniego, Goodrich testified that he was sure that he landed "[a]t least two" blows on him with the sledgehammer.  At one point, Samaniego swung the sledgehammer and missed him.  Goodrich testified that Samaniego might have hit a picnic table with his sledgehammer as concrete shards flew around, but the shards did not hit him.

On cross-examination, the defense attorneys returned to the subject of the weapons:

"Q      Who swung first?

"A      Uh, William Webb with the long-handed shovel."

Goodrich acknowledged he previously testified that he did not know who specifically hit him, that he later said each defendant hit him two times, and that "was an approximation, once to twice."

"Q      Well, was it an approximation, or was it a guess?

7.

"A    Well, at least – you know, I am not 100 percent sure of whom hit me with all of the blows and … which person did … each and every blow that connected with me.  I do not know.

"Q    So –

"A    It was a flurry."

Goodrich explained that as he testified, he had "more clarity" about the assault because he thought about what happened, and he could be more specific.  "You were asking about if I knew how many times each and every one of them delivered blows to me through that [melee].  No, I do not.  I do not have a specific count on it."  "The specific count as to how many times each and every one of them hit me?  No, I don't know that number."

"Q    So yesterday … you could remember Mr. Webb specifically hitting you?

"A    Yes.

"Q    So has that changed since yesterday?

"A    As to specific blows that did connect?  Yes, I can.

"Q    And as you sit here today, you think each of them hit you two times?

"A    Oh, yes.  At least, yes."

## IV.    The Assault Ends.

Goodrich testified that the three defendants eventually became tired, backed away, and the assault ended.  Goodrich was exhausted.  He sat down, caught his breath, announced he was leaving, and walked away from the picnic area.  Goodrich headed toward the parking lot, about 50 to 70 feet away from the scene of the assault.  The parking lot was illuminated by lights, and Goodrich thought he would be safe there.  Goodrich had his backpack and tent but left behind his other possessions in the picnic area; he did not try to find his bicycle.  Luna initially followed Goodrich into the parking lot and was "trying to hurry me along," but stopped following him when Goodrich got to the lighted area.

8.

Goodrich kept walking until he got to an intersection. He retrieved his cell phone from his backpack and called 911, and the police quickly arrived.

## V.    The Police Arrive.

At 9:39 p.m., Madera Police Officer Santoyo responded and contacted Goodrich, who was sitting on a curb and appeared scared. The top right side of his head was actively bleeding. His face and hair were covered in blood, his right eye was swollen, and there was a laceration on the bridge of his nose.

Officer Santoyo testified that Goodrich said he had been in an altercation, gave his knife to Santoyo, and said he used it to defend himself.

Officer Santoyo testified that Goodrich gave the following account of what happened and referred to the suspects by their first names. Goodrich said that Polo (later identified as Luna) got very angry and told Goodrich if he did not hurry up and leave, he was going to have "his homeboys" beat him up, referring to Franky and Will (Samaniego and Webb). Goodrich said that he was afraid Polo, Franky, and Will were going to attack him. Goodrich pulled out his folding knife and told Polo to back up until he could get away. Polo did not have a weapon at that time but "rushed" him. Goodrich said that he swung his knife at Polo, and believed he made contact somewhere on Polo's face. After that, he was attacked by Polo, Franky, and Will. Goodrich said that it was very dark, and he could not remember who used what weapon, but he remembered being hit by a shovel, an axe, and a knife. Goodrich said that he was able to fight his way out and escape.

Officer Santoyo went to the picnic area where the assault occurred, and it was very dark and "pitch black" there. The suspects were gone, but Santoyo found an axe with blood on it and a few of Goodrich's belongings. He did not find Goodrich's sleeping bag or bicycle.

## VI.    Goodrich's Injuries.

Goodrich was taken by ambulance to the hospital that night. As a result of the assault, Goodrich suffered fractures to his skull and on the right side of his face, a broken nose, and abrasions to his arms, shoulder, and back of his neck. There was so much

pressure caused by blood and fluid between his brain and skull, that physicians had to cut two tendons on the side of his eye to relieve the pressure. Goodrich was placed on a morphine drip to prevent seizures and antibiotics to prevent infections. He was released from the hospital on June 2, 2020. About four or five weeks after he was released, he returned to the hospital for removal of staples that were placed in his skull.

At the time of trial, five months after the assault, Goodrich still had blurry eyesight, dizzy spells, and high blood pressure that he did not have before.

## VII. Goodrich's Pretrial Statements.

On May 28, 2020, Officer Gonzales spoke with Goodrich on the telephone about the assault. At that time, Goodrich said that he believed Luna and Webb were having "a side conversation together" in the picnic area, and "they were saying, 'Why hadn't we killed him yet,' " referring to Goodrich. Goodrich said that three subjects hit him with an axe and shovel, and Webb retrieved the shovel and Samaniego retrieved the axe. Goodrich did not mention a sledgehammer. Goodrich said that Luna should have a large cut on his chin.

On June 1, 2020, Officer Gonzales met with Goodrich at the hospital and testified that Goodrich was hooked up to monitors and IV bottles. Goodrich's right eye was bruised, discolored, swollen, and he could not open it. There were bruises under his left eye. There were staples on a wound on top of his head, and scratches on his arms or upper torso. Gonzales took photographs of Goodrich's injuries, and the pictures were introduced at trial.

On the same day, Officer Gonzales conducted a recorded interview with Goodrich. Goodrich said that he had heard Luna and Webb talking, and the "gist" of their conversation made him "wonder" if they were talking about killing him. Goodrich said that he cut Luna with his knife, and Luna should have a large cut on his chin area. Goodrich said that he jumped on the picnic table as he tried to defend himself. Goodrich also said, " 'They were hitting stuff with their sledgehammers trying to scare me,' "

10.

someone hit a picnic table with a sledgehammer, and the table should be damaged. Goodrich said all three men followed him to the parking lot.[3]

## VIII. The Arrests of Defendants and Their Pretrial Statements.

On June 1, 2020, Officer Gonzales came into contact with Webb at the picnic area where Goodrich was assaulted. Webb was with Samaniego.

On June 2, 2020, Officer Gonzales saw Luna riding a bicycle toward the picnic area. Gonzales was familiar with Luna because he had seen him about a month earlier at the same picnic area when Luna was with Samaniego.

On June 2, 2020, Officer Brian Majors saw Luna riding a bicycle near Millview Middle School. Majors stopped Luna and placed him under arrest because of the investigation in this case. Majors noticed Luna had a cut on his chin and asked him about it. Luna said that he had fallen. Majors searched Luna and asked him if he had any contraband. Luna indicated that he had something in his pocket, and Majors found a white substance that appeared to be crystal methamphetamine.

Also on June 2, 2020, Officer Gonzales met with Luna at the police station, advised him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and Luna agreed to answer questions. Gonzales asked about the cut on his chin. Luna said that he had cut himself in a shaving accident. In response to questions, Luna said that he was known as "Polo," and he knew Goodrich. He denied being in any type of altercation

---

[3] At trial, Goodrich testified that he never told anyone Samaniego retrieved an axe and Webb separately got a shovel; that there were multiple sledgehammers; that he was hit with a knife; that he jumped on top of a table during the fight; that he had to fight his way out to escape; that all three defendants followed him to the parking lot area; or that any of the defendants threatened members of his family.

Goodrich admitted that during breaks in his trial testimony, he asked the prosecutor about certain aspects of the investigation, but that information did not affect his testimony, and he was not fabricating anything about the assault. While he asked the prosecutor about the case during the breaks, he testified, "[W]hat difference does it make whether who hit me? They were all trying to hit me."

11.

with Goodrich. Luna did not claim that Goodrich used a knife against him or that he had to defend himself against Goodrich.

Detective Gonzales testified that he separately interviewed Webb and Samaniego. In those interviews, both men acknowledged being at the picnic area on the evening of May 28, 2020.

## DEFENSE EVIDENCE

None of the defendants testified. Luna and Samaniego did not introduce any defense evidence.

Webb called Yvette Paul, an investigator for the district attorney's office, as a defense witness. Ms. Paul testified that she contacted Goodrich on September 1, 2020, to get his consent to obtain his medical records. During this contact, Ms. Paul did not conduct a formal interview or ask any questions, but Goodrich started to talk about the assault. Goodrich said that "he believed the attack was premeditated," and Webb "was waiting for him and that he had a shovel and used that to hit him with." Goodrich said that after the assault, Webb told him not to tell anyone what had happened, or Webb would hurt Goodrich's family. Goodrich said that Webb threatened to kill Goodrich's sister in Visalia, his father and niece in Hanford, and other family members in Santa Barbara.

Goodrich also told Ms. Paul that, at a later date following the assault, he was sitting in a park and near a table, something hit the table and exploded; he thought someone shot at him. Goodrich said that on another day, he was sitting near a tree and heard a loud sound above him, like an explosion, and pieces of the tree fell around him; he thought it was another gunshot. Goodrich was not sure if these incidents had anything to do with the assault or were just coincidental.

## PROCEDURAL BACKGROUND

On October 14, 2020, a first amended information was filed in the Superior Court of Madera County, charging defendants Luna, Webb, and Samaniego with count 1, assault with a deadly weapon (§ 245, subd. (a)(1)), with enhancements as to all three

12.

defendants, that they personally inflicted great bodily injury on Goodrich in the commission of the assault (§ 12022.7, subd. (a)). Luna was separately charged in count 2 with misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)).

As to count 1, it was further alleged that Webb and Luna each had one prior strike conviction and one prior serious felony enhancement (§§ 667, subds. (a), (b)–(i), 1170.12).

## I. Trial and Verdicts.

On October 15, 2020, the joint trial began for the three defendants. On December 1, 2020, Luna, Webb, and Samaniego were convicted as charged of count 1, assault with a deadly weapon. As to Luna and Webb, the jury found true the enhancements attached to count 1, that each personally inflicted great bodily injury on the victim in the commission of the offense.

The jury was unable to reach a finding on the great bodily injury enhancement alleged as to Samaniego. The court declared a mistrial on Samaniego's enhancement, and it was later dismissed.

Luna was found not guilty of count 2, misdemeanor possession.

## II. The Court Trial on the Prior Conviction Allegations.

The first amended information alleged that Luna and Webb each had one prior strike conviction and one prior serious felony enhancement, based on Luna's prior conviction for assault with a deadly weapon in 2010 (§ 245, subd. (a)), and Webb's prior conviction for commission of a lewd or lascivious act on a child under the age of 14 years in 1996 (§ 288, subd. (a)). Both defendants waived a jury trial on the special allegations.

On December 4, 2020, the court held a bench trial on the truth of the prior conviction allegations. The prosecutor introduced documentary exhibits consisting of certified copies of abstracts of judgment, and the chronological/movement history for both defendants from the California Department of Corrections and Rehabilitation (CDCR). The defense attorneys did not object to the exhibits and submitted the matter,

13.

and the court admitted the documentary exhibits into evidence. The court found all prior conviction allegations to be true beyond a reasonable doubt for both Luna and Webb.

### III. Sentencing Hearings[4]

On January 15, 2021, the court conducted the sentencing hearing for Luna. The court denied Luna's motion to dismiss the prior serious felony enhancement and imposed an aggregate sentence of 16 years, based on the upper term of four years for assault, doubled to eight years as the second strike term, plus three years for the great bodily injury enhancement, and five years for the serious felony enhancement. The court also imposed fines and fees.

On January 29, 2021, the court conducted Webb's sentencing hearing and denied his request to dismiss the prior strike conviction. As to count 1, assault with a deadly weapon, the court imposed the upper term of four years, doubled to eight years as the second strike sentence, plus consecutive terms of three years for the great bodily injury enhancement and five years for the prior serious felony conviction, for an aggregate sentence of 16 years. The court also imposed fines and fees.

### IV. Direct Appeal.

Luna and Webb, respectively, filed timely notices of appeal, and this consolidated their appeals. Samaniego is not part of the instant appeal.

In 2023, this court filed the nonpublished opinion in the consolidated appeal, ordered correction of Webb's credits, and otherwise affirmed the judgments. As explained above, we found the trial court's erroneous imposition of the upper terms for both defendants was not prejudicial because there was a reasonable probability that the jury would have found the aggravating circumstances were true beyond a reasonable doubt. Also as explained above, the California Supreme Court transferred this matter

---

**4** In parts II and III, *post*, we will address defendants' sentencing hearings as relevant to their appellate contentions that the court improperly imposed upper terms in violation of Senate Bill 567's amendments to section 1170, subdivision (b).

14.

back and directed this court to vacate our prior opinion and reconsider the cause in light of *Lynch* and *Erlinger.*

**DISCUSSION**

**I.     Substantial Evidence of the Great Bodily Injury Enhancements**

Luna and Webb argue there is insufficient evidence to support the jury's true findings on the enhancements that they personally inflicted great bodily injury on Goodrich in the commission of the assault.  Defendants acknowledge there was "no real question Goodrich suffered injuries, including some great bodily injuries."  They argue, however, there is insufficient evidence to prove which defendant inflicted the blows that actually landed on his face and head, and Goodrich's testimony about the assault was inconsistent and undermined by his prior statements.

**A.     *Substantial evidence*.**

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)  "[W]e must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt.  We review the entire record in the light most favorable to the judgment below to determine whether it discloses sufficient evidence – that is, evidence that is reasonable, credible, and of solid value – supporting the decision, and not whether the evidence proves guilt beyond a reasonable doubt. [Citation.]  We neither reweigh the evidence nor reevaluate the credibility of witnesses. [Citation.]  We presume in support of the judgment the existence of every fact the jury reasonably could deduce from the evidence." (*People v. Jennings* (2010) 50 Cal.4th 616, 638–639.)

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence.  [Citation.]  We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence.  [Citation.]'  [Citation.]  'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible

15.

of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.  [Citation.]'  [Citation.]  Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357–358.)

### B.     *Personal infliction of great bodily injury*.

Section 12022.7, subdivision (a) defines the great bodily injury enhancement that the jury found true in this case:  "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

The phrase "great bodily injury" as used in section 12022.7 is defined as " 'bodily injury which is significant or substantial, not insignificant, trivial or moderate.'  [Citation.]  '[T]he injury need not be so grave as to cause the victim " 'permanent,' 'prolonged,' or 'protracted' " bodily damage.' "  (*People v. Quinonez* (2020) 46 Cal.App.5th 457, 464.)  " 'Proof that a victim's bodily injury is "great" – that is, significant or substantial within the meaning of section 12022.7 – is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury.'  [Citation.]  While 'any medical treatment obtained by the victim is relevant to determining the existence of "great bodily injury" [citation], the statutory definition and relevant … instruction … do not require a showing of necessity of medical treatment.  Nor are we aware of any case authority imposing such a requirement.' "  (*Ibid*.)  "[D]etermining whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury."  (*People v. Cross* (2008) 45 Cal.4th 58, 64.)

This type of enhancement "arise[s] from the *circumstances of the crime* and typically focus[es] on what the defendant did when the current offense was committed."

(*People v. Coronado* (1995) 12 Cal.4th 145, 157; *People v. Ollo* (2021) 11 Cal.5th 682, 687 (*Ollo*).)

The meaning of "personally inflict" as used in section 12022.7 "is clear and unambiguous in the context of injuries resulting from the direct application of physical force. [Citation.] Commonly understood, the term 'personally' refers to 'an act performed "in person," and involving "the actual or immediate presence or action of the individual person himself (as opposed to a substitute, deputy, messenger, etc.)." ' [Citation.] The verb 'to inflict' means ' "to lay (a blow) on: cause (something damaging or painful) to be endured: impose." ' [Citation.] The meaning of the statutory requirement that a defendant personally inflict the victim's injury does not differ from its nonlegal meaning. [Citation.] '[T]he phrase "personally inflicts" means that someone "in person" …, that is, directly and not through an intermediary, "cause[s] something (damaging or painful) to be endured." ' " (*Ollo, supra*, 11 Cal.5th at pp. 687–688.)

## C.     *Group assaults and the personal infliction enhancement.*

Defendants do not dispute that Goodrich suffered great bodily injury. They contend, however, there is insufficient evidence that each defendant personally inflicted great bodily injury upon him during the group assault.

"[O]ne who merely aids, abets, or directs another to inflict the physical injury is not subject to the enhanced penalty of section 12022.7." (*People v. Cole* (1982) 31 Cal.3d 568, 571; *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 348–349.)

*Cole* has been repeatedly distinguished in cases where multiple defendants have been convicted of assault, with enhancements found true for the personal infliction of great bodily injury, when there has been a group beating. In *People v. Dominick* (1986) 182 Cal.App.3d 1174, the court upheld a section 12022.7 enhancement for a defendant who did not actually strike the victim, but who grabbed her hair and held her so that she could be hit by another. *Dominick* affirmed the enhancement for personal infliction of great bodily injury because these acts "constituted more than aiding and abetting," and contributed to the great bodily injury the victim suffered. (*Id.* at p. 1211.)

17.

In *People v. Corona* (1989) 213 Cal.App.3d 589 (*Corona*), the court created an express exception to *Cole* in the group beating context. "While *Cole* has logical application with regard to the section 12022.7 culpability of an aider and abettor who strikes no blow, *it makes no sense when applied to a group pummeling*. Central to *Cole* is the conclusion that the deterrent intent of section 12022.7 is served by directing its increased punishment at the actor who ultimately inflicts the injury. Applying *Cole* uncritically in the context of this case does not create a deterrent effect. Rather it would lead to the insulation of individuals who engage in group beatings. Only those whose foot could be traced to a particular kick, whose fist could be patterned to a certain blow or whose weapon could be aligned with a visible injury would be punished. The more severe the beating, the more difficult would be the tracing of culpability." (*Corona,* at p. 594, italics added.)

*Corona* declined to state a "universally applicable test" but held that "when a defendant participates in a group beating and when it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered." (*Corona, supra*, 213 Cal.App.3d at p. 594.)

The Supreme Court addressed group assaults in *People v. Modiri* (2006) 39 Cal.4th 481 (*Modiri*). In that case, the defendant was at a party and participated in a group attack that left the victim with serious injuries. "The evidence showed that [the] defendant personally applied physical force to the victim several times. However, chaos at the scene prevented witnesses from linking the victim's injuries to a particular assailant, weapon, or blow." (*Id*. at p. 485.) The defendant was convicted of felony assault with a deadly weapon. "To enhance the sentence in any *future* prosecution, the jury sustained an allegation that, in the course of the assault, [the] defendant 'personally inflict[ed] great bodily injury' on the victim. (§ 1192.7, subd. (c)(8)...." (*Ibid*.)

As to the personal infliction allegation in *Modiri*, the trial court gave CALJIC No. 17.20, that stated the "defendant must personally have inflicted great bodily harm.

18.

The same instruction also said that if he participated in a group attack, and jurors could not decide which person inflicted which injury, the allegation could be sustained if [the] defendant personally applied physical force to the victim either (1) of a nature that, 'by itself,' could have caused great bodily injury, or (2) under such circumstances that the 'cumulative effect' of the force used by all participants would have caused the injury." (*Modiri, supra*, 39 Cal.4th at pp. 485–486.)

*Modiri*, approvingly citing *Corona* and *Dominick*, held that CALJIC No. 17.20 was a correct statement of the law, and concluded that a defendant, who participated in a group beating, could be found to have personally inflicted great bodily injury on the victim. (*Modiri, supra*, 39 Cal.4th at p. 486.)

"No instructional error occurred at trial. For 20 years, courts have upheld personal infliction findings where the defendant physically joins a group attack, and directly applies force to the victim sufficient to inflict, or contribute to the infliction of, great bodily harm. Consistent with the statutory language and the manner in which it has been judicially construed, *the defendant need not be the sole or definite cause of a specific injury*. [T]hese group beating principles have been accepted by the Legislature. CALJIC No. 17.20 duly describes them. A contrary approach would mean that those who perpetrate mob violence and inflict gratuitous injury would often evade enhanced punishment." (*Ibid*., italics added.)

In reaching this conclusion, *Modiri* acknowledged and limited the holding in *Cole*:

> "… *Cole* stands for the modest proposition that a defendant personally inflicts great bodily harm only if there is a direct physical link between his own act and the victim's injury. Under *Cole,* someone who does not strike or otherwise personally use force upon the victim does not qualify for enhanced punishment where the personal infliction of harm is required.… CALJIC No. 17.20 follows this rule. However, consistent with the instruction, nothing in *Cole* precludes a person from receiving enhanced sentencing treatment *where he joins others in actually beating and harming the victim, and where the precise manner in which he contributes to the victim's injuries cannot be measured or ascertained*." (*Modiri, supra*, 39 Cal.4th at p. 495, italics added.)

19.

*Modiri* held that while California's courts have followed *Cole*, "participation in a group attack may satisfy sections 1192.7[, subdivision] (c)(8) and 12022.7[, subdivision] (a) where the defendant personally uses force against the victim, and the precise injurious effect is unclear." (*Modiri, supra*, 39 Cal.4th at pp. 495–496.)

*Modiri* recognized two theories where liability may be imposed for personal infliction of great bodily injury in group beating situations. (*Modiri, supra*, 39 Cal.4th at p. 496.) In one type of a group beating, "the force personally used by the defendant during a group attack was serious enough that it may, *by itself*, have caused great bodily injury, even though the evidence did not show for certain that the defendant's acts alone perpetrated specific harm or that nobody else injured the victim." (*Ibid.*) In the second type of group beating cases, "a personal infliction finding [was affirmed] where the physical force the defendant and other persons applied to the victim at the same time *combined* to cause great bodily harm." (*Ibid.*)

*Modiri* held these two theories, as applied to group beating cases, were sound because "those who participate directly and substantially in a group beating should not be immune from a personal infliction finding for the sole reason that the resulting confusion prevents a showing or determination of this kind." (*Modiri, supra*, 39 Cal.4th at pp. 496–497.)

> "Defendant's contrary view would mean that '[o]nly those whose foot could be traced to a particular kick, whose fist could be patterned to a certain blow or whose weapon could be aligned with a visible injury would be punished. The more severe the beating, the more difficult would be the tracing of culpability.' [Citation.] Under such circumstances, all participants in a group attack who personally caused or contributed to the infliction of harm could conceivably escape enhanced punishment. Given the apparent goal of deterring and punishing gratuitous violence, the drafters of sections 1192.7(c)(8) and 12022.7(a) could not have intended that result." (*Id.* at p. 497, citing *Corona, supra*, 213 Cal.App.3d at p. 594; *Ollo, supra*, 11 Cal.5th at pp. 688–689.)

*Modiri* held CALJIC No. 17.20 reasonably and correctly conveyed the operative legal principles. (*Modiri, supra*, 39 Cal.4th at p. 493)

"CALJIC No. 17.20 requires jurors to first determine the defendant's guilt of the charged crime. The instruction applies if they then decide that he 'participate[d]' in a group beating, and that 'it is not possible' to determine which assailant inflicted a particular injury. [Citation.] Both prongs of the instruction permit a personal infliction finding in this instance only if the defendant personally 'appli[es] unlawful physical force' to the victim. [Citation.] CALJIC No. 17.20 makes clear that the physical force personally applied by the defendant must have been sufficient to produce great bodily injury either (1) by itself, or (2) in combination with other assailants. *Both group beating theories exclude persons who merely assist someone else in producing injury, and who do not personally and directly inflict it themselves.*

"It bears emphasis that CALJIC No. 17.20 contemplates acts that contribute substantially to the victim's injured state. By definition, 'force' involves 'power, violence, compulsion, or constraint exerted upon or against a person.' [Citations.] Also, the instruction's group beating theories preclude a section 1192.7[, subdivision] (c)(8) finding where the defendant's conduct 'could [not] have,' or 'would [not have],' caused or contributed to the requisite harm. [Citation.] In light of these qualifications, the defendant's role in both the physical attack and the infliction of great bodily injury *cannot be minor, trivial, or insubstantial*. The instruction thus does not conflict with the statutory language in the manner [the] defendant suggests." (*Id*. at pp. 493–494, italics added.)

*Modiri* affirmed the jury's finding on the great bodily injury allegation. (*Modiri, supra*, 39 Cal.4th at pp. 486, 501–502.) "Here, after initially punching Schon [the victim] in the face, [the] defendant was seen in the group of 10 to 15 people who swarmed and beat Schon after he had been knocked down. The evidence suggested that [the] defendant also struck Schon on the head with bottles during the melee …. However, the violence initiated by [the] defendant and escalated by the group prevented any evidence or determination whether [the] defendant's blows were the exact ones that broke Schon's nose, cut his head, or caused other trauma. *Under CALJIC No. 17.20, a personal infliction finding could nonetheless be made if [the] defendant personally applied force to the victim, and such force was sufficient to produce grievous bodily harm either alone or in concert with others*. Thus, use of this instruction in the present case followed statutory law, as applied by the courts." (*Id*. at p. 497, italics added.)

In *People v. Dunkerson* (2007) 155 Cal.App.4th 1413 (*Dunkerson*), the defendant was convicted of assault after a group beating, with an enhancement for personally inflicting great bodily injury. On appeal, he argued the court erroneously gave CALCRIM No. 3160, the successor instruction to CALJIC No. 17.20, because it "improperly allowed the jury to find he personally inflicted great bodily injury even though others in the group may have caused the injury." (*Dunkerson,* at p. 1414.)

*Dunkerson* held there was no instructional error because *Modiri* rejected identical arguments "involving CALJIC No. 17.20, which is not materially different from CALCRIM No. 3160 with respect to the issue raised by [the] defendant." (*Dunkerson, supra*, 155 Cal.App.5th at p. 1414.) *Dunkerson* held that CALJIC No. 17.20 and CALCRIM No. 3160 "each provide the jury with the same guidance, allowing the jury to find that the defendant personally inflicted great bodily injury during a group assault where it is impossible to determine which person caused which injury to the victim." (*Dunkerson,* at p. 1418.)

As to the specific facts of that case, *Dunkerson* held: "Even though it might be difficult to link [the victim's] specific injuries to specific blows by [the] defendant, the evidence showed that [the] defendant personally applied physical force to [the victim] several times. When [the defendant's mother] told [the] defendant that [the victim] hit her, [the] defendant was the first to attack [the victim]. During the melee of blows to his head and ribs, it seemed to [the victim] that most of the force was coming from [the] defendant. It was [the] defendant who commanded that the group put [the victim] against the couch. And it was [the] defendant who stayed an extra few seconds after the rest of the group left to deliver eight to 10 more kicks to [the victim's] head." (*Dunkerson*, *supra*, 155 Cal.App.5th at p. 1418.)

### D.    *CALCRIM No. 3160*.

The jury in this case was instructed with CALCRIM No. 875 on the elements of the charged offense of assault with a deadly weapon, as alleged in count 1. As relevant to defendants' arguments, the jury was also instructed with CALCRIM No. 3160 on the

great bodily injury enhancement and group assaults. This instruction was approved in *Dunkerson* as providing the same guidance as CALJIC No. 17.20, that itself was approved in *Modiri*. As given to the jury in this case, CALCRIM No. 3160 stated:

> "If you find the defendants or any of them guilty of the crime charged in Count 1, assault with a deadly weapon, you must then decide whether the People have proved the additional allegation that the defendant personally inflicted great bodily injury upon Kevin Goodrich during the commission of that crime. " 'Great bodily injury' means significant or substantial physical. It is an injury that is greater than minor or moderate harm.

> "If you conclude that more than one person assaulted Kevin Goodrich and you cannot decide which person caused which injury, you may conclude that the defendant personally inflicted great bodily injury on Kevin Goodrich if the People have proved that:

> "One, two or more people acting at the same time assaulting Kevin Goodrich and inflicted great bodily injury on him;

> "Two, the defendant personally used physical force on Kevin Goodrich during the group assault;

> "And, three, the amount or type of physical force the defendant used on Kevin Goodrich was enough that it alone could have caused Kevin Goodrich to suffer great bodily injury.

> **"**The defendant must have applied substantial force to Kevin Goodrich. If that force could not have caused or contributed to great bodily injury, then it was not substantial.

> "The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (Italics added.)

The jury was also instructed with CALCRIM No. 3470, that lawful self-defense or defense of others was a defense to count 1, assault with a deadly weapon; that a defendant was not guilty if he reasonably believed he or someone else was in imminent danger of suffering bodily injury or of being unlawfully touched, that the immediate use of force was necessary, and he used no more force than was reasonably necessary to defend against the danger; that a defendant was not required to retreat and was entitled to

23.

stand his ground and defendant himself, if reasonably necessary, to pursue the assailant even if safety could have been achieved by retreating; and the People had the burden to prove beyond a reasonable doubt that defendant did not act in lawful self-defense or defense of others.

### E.    *Closing arguments.*

In his closing argument, the prosecutor reviewed the language of CALCRIM No. 3160 about group assaults.  He argued it was applicable because Goodrich testified that the three defendants attacked him simultaneously; the axe, sledgehammer, and shovel were deadly weapons; each defendant had a deadly weapon and used it to assault him; and Goodrich's head and skull injuries constituted great bodily injuries.  The prosecutor argued that based on Goodrich's testimony, "being hit with a shovel, being hit with an axe, or being hit with a sledgehammer, all three of those are the type of physical force that were used on him.  And those individually and alone could have caused Kevin Goodrich to suffer great bodily injury."

In their separate closing arguments, each defense attorney attacked Goodrich's credibility, his inconsistent statements about the incident, that he was the first person who pulled a knife and cut Luna, and he was the instigator.

Luna's attorney argued that Luna was not guilty because he was engaged in lawful self-defense and, in the alternative, he was only guilty of a simple assault.  Webb's attorney argued that he was not guilty because there was no crime, and Webb may have stepped in to help Luna after Goodrich slashed him.

### F.    *Defendants' appellate arguments.*

Webb and Luna agree, for the purposes of this appeal, "that each defendant used a deadly weapon at the time of the assault," and the jury was properly instructed with CALCRIM No. 3160.  Webb further agrees there was substantial evidence that he "swung a shovel at Goodrich," does not dispute that he "swung at Goodrich's head," and "at least of two of [his] swings actually landed on Goodrich's body."

Nevertheless, defendants Luna and Webb argue the great bodily injury enhancements must be stricken because there is "no telling … which defendant struck a substantial blow that actually landed on Goodrich's face and head." They argue that Goodrich's trial testimony was inconsistent about "which weapons were used and by whom during the assault," he could not connect any particular defendant to any weapon and any specific bodily injury, and his testimony changed throughout trial.

Defendants further argue that even in a group assault case, the prosecution must prove beyond a reasonable doubt "that at least one of the defendant's blows were applied to the victim with such substantial force that it alone could have caused the great bodily injury." The prosecution "was never able to establish beyond a reasonable doubt that all three defendants actually landed a blow to Goodrich's face and head area which by itself could have caused the great bodily injuries."

### G. *Analysis*.

The arguments raised by Luna and Webb are meritless. CALCRIM No. 3160 correctly stated the elements for an enhancement for personal infliction of great bodily injury during a group assault – that two or more people assaulted Goodrich at the same time and inflicted great bodily injury on him; each defendant personally used physical force during the assault; and each defendant used the amount or type of force that alone could have caused Goodrich to suffer great bodily injury. The jury was further instructed that each defendant must have applied substantial force to Goodrich and, if that force could not have caused or contributed to great bodily injury, then it was not substantial.

Luna and Webb have conceded Goodrich suffered great bodily injuries as a result of the group assault. The trial evidence established Goodrich was assaulted by Luna and Webb at the same time, and no one else was present when the defendants converged on him with their weapons.[5] Goodrich testified that Webb used a metal shovel with a round

---

[5] We limit our analysis to the evidence about Luna and Webb, since Samaniego is not part of the instant appeal, and the jury did not reach a finding on the great bodily injury enhancement attached to his conviction.

nosed spade, Luna used a steel axe, and each defendant was able to hit him with their weapons.

Goodrich repeatedly and consistently testified the defendants hit him with their weapons, and they hit him "mostly" in his head and upper body – an account consistent with the fractures to Goodrich's skull and the right side of his face. While he was not sure which defendant inflicted which injuries, he testified that "they were all swinging at me," and he was hit in the face and head multiple times – again, an account completely consistent with suffering a fractured skull and face. When asked to clarify the number of blows, he was certain Luna hit him at least twice with the axe and Webb hit him at least twice with the shovel. On cross examination, Goodrich acknowledged he did not have "a specific count" about the number of blows inflicted by each defendant and his testimony "was an approximation, once to twice."

As set forth in *Modiri* and CALCRIM No. 3160, the jury's true findings on the great bodily injury enhancements for Luna and Webb are supported by substantial evidence. Goodrich was assaulted by defendants, each of whom had a weapon; an axe was found in the picnic area that had blood on it. Goodrich suffered a skull fracture and other great bodily injuries to his head and face that required surgery, all of which were consistent with such an assault.

Nevertheless, defendants assert that Goodrich's testimony still lacked specificity to support the enhancements, because he could not state that any of the defendants inflicted a particular blow that would have inflicted great bodily injury to his face or head.[6] As explained in *Modiri*, however, such an argument "would mean that '[o]nly

---

[6] Defendant states the prosecutor relied on CALCRIM No. 3160 in closing argument when he asserted that while Goodrich could not tell which person hit him where, " 'he did testify that all three hit him and all three hit him in his face and head area.' " Defense counsel now argues, for the first time, that the prosecutor's closing argument "was not supported by the evidence" because the prosecutor was never able to establish beyond a reasonable doubt that "all three defendants actually landed a blow to Goodrich's face and head area which by itself could have caused the great bodily injuries." To the extent that defendants may be raising a claim of prosecutorial

26.

those whose foot could be traced to a particular kick, whose fist could be patterned to a certain blow or whose weapon could be aligned with a visible injury would be punished. The more severe the beating, the more difficult would be the tracing of culpability.' [Citation.] Under such circumstances, all participants in a group attack who personally caused or contributed to the infliction of harm could conceivably escape enhanced punishment. Given the apparent goal of deterring and punishing gratuitous violence, the drafters of sections 1192.7[, subdivision] (c)(8) and 12022.7[, subdivision] (a) could not have intended that result." (*Modiri, supra*, 39 Cal.4th at p. 497; *Ollo, supra*, 11 Cal.5th at pp. 688–689.)

Defendants further argue Goodrich's credibility was undermined by his inconsistent statements about the sequence of events during the group assault, each defendant's conduct, the type of weapons that were used, and his own conduct. In reviewing the jury's true findings on enhancements for substantial evidence, " '[i]t is for the trier of fact to consider internal inconsistencies in testimony' [citation], and it is for [the appellate court] when reviewing for substantial evidence to resolve the inconsistencies in favor of the verdict." (*People v. Collins* (2021) 65 Cal.App.5th 333, 345.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) Reversal is "unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) Goodrich was subject to extensive cross examination by the defense attorneys, who cited his inconsistent statements in their closing arguments in support of their assertions that the prosecution failed to prove the truth of the enhancements beyond a reasonable doubt. The jury obviously rejected these

misconduct, the issue has been forfeited because there were no objections to this portion of the prosecutor's closing argument. (*People v. Mendoza* (2016) 62 Cal.4th 856, 905.) Moreover, the prosecutor's argument was fair commentary on Goodrich's trial testimony.

defense arguments, including their claims of self-defense. There was nothing physically impossible or inherently improbable in Goodrich's trial testimony.

Goodrich's testimony, viewed in the light most favorable to the judgment and resolving all conflicting inferences in favor of the prosecution, was sufficient for a rational trier of fact to find beyond a reasonable doubt that Luna and Webb personally inflicted great bodily injury on him during the group assault.

## II. The Trial Court's Imposition of the Upper Terms.

Before addressing defendants' contentions about the trial court's imposition of the upper term for their convictions of assault with a deadly weapon, we review the sentencing proceedings for both Luna and Webb.

### A. *Luna's sentencing proceedings*.

As explained above, the first amended information alleged Luna had a prior strike conviction and a prior serious felony enhancement. Both allegations were based on his prior conviction for assault with a deadly weapon in 2010 (§ 245, subd. (a)).

At the court trial on the truth of the prior conviction allegations, the prosecution introduced documentary exhibits that consisted of certified records of abstracts of judgment and Luna's chronological/movement history from CDCR, which set forth his prior criminal convictions and prison sentences. The court found all prior conviction allegations true.

The probation report summarized Luna's prior convictions and stated Luna was statutorily ineligible for probation because of his prior strike conviction (§ 667, subd. (e)(1)). The probation report listed the following circumstances in aggravation pursuant to California Rules of Court, rule 4.421: Luna's prior convictions were numerous, he served a prior prison term, and his prior performance on probation and parole was unsatisfactory. The report further stated that under rule 4.423, there were no circumstances in mitigation. The probation report concluded that the circumstances in aggravation preponderated and recommended imposition of the upper term for the assault conviction, for an aggregate term of 16 years.

28.

On January 15, 2021, the court conducted the sentencing hearing for Luna. After hearing arguments from the parties, the court made the following findings:

"I will note under ... Section 667, subdivision (e), subdivision (i) [*sic*], the defendant [Luna] is statutorily ineligible for probation.

"The defendant was armed with and used a weapon during the course of the perpetration of the crime for which he's been convicted. The victim was vulnerable, as he was outnumbered; there were three assailants to the one victim. The defendant inflicted physical injury on the victim and was an active participant in the commission of the crime.

"Mr. Luna has a significant record of criminal conduct. His prior performance on probation and parole was unsatisfactory.

"Until today, the defendant had not expressed remorse. I have in mind, however, the statements on his behalf by [Luna's defense attorney] made here today in that regard.

"And I will note that the defendant is likely a danger to the community if not imprisoned, based upon the activity of the instant offense.

"By way of circumstances in aggravation, the defendant's prior convictions are numerous. He has served a prior prison term. His prior performance on probation and parole was unsatisfactory.

"Under [California Rules of Court,] [r]ule 4.423, I do not find circumstances in mitigation applicable in this matter." (Italics added.)

The court denied Luna's motion to dismiss the prior serious felony enhancement because "under the circumstances of the particular offense and the status of [Luna] in his history here, the consecutive enhancement is appropriate."

The court sentenced Luna to an aggregate term of 16 years based on the upper term of four years for assault with a deadly weapon, doubled to eight years as the second strike sentence; plus consecutive terms of three years for the great bodily injury enhancement and five years for the prior serious felony enhancement.

**B.      *Webb's sentencing proceedings.***

The first amended information alleged Webb had a prior strike conviction and a prior serious felony enhancement. Both allegations were based on his conviction for

commission of a lewd or lascivious act on a child under the age of 14 years in 1996 (§ 288, subd. (a)).

At the court trial on the prior conviction allegations, the prosecution introduced documentary exhibits that consisted of certified records of Webb's prior conviction and his chronological/movement history from CDCR. The court found all prior conviction allegations true

Webb's probation report summarized his prior record and stated he was statutorily ineligible for probation because of his prior strike conviction (§ 667, subd. (e)(1)). The probation report stated the following aggravating circumstances pursuant to California Rules of Court, rule 4.421: Webb's prior convictions were numerous, he served a prior prison term, and his prior performance on probation and parole was unsatisfactory. There were no mitigating circumstances under rule 4.423.

The probation report concluded that Webb was statutorily ineligible and not a proper candidate for probation, the circumstances in aggravation were preponderate, the aggravated term in state prison was appropriate, and recommended an aggregate sentence of 16 years.

On January 29, 2021, the court conducted Webb's sentencing hearing. After hearing arguments from the parties, the court rejected Webb's arguments that there were mitigating circumstances. The court found Webb's current conviction was for a serious and violent offense, his self-defense claims were rejected by the jury, he had the opportunity to walk away from what happened, he was not compelled to participate in the assault but elected to do so, and his involvement was not passive.

The court imposed sentence as follows:

"[Webb] is statutorily ineligible for probation under [section] … 667(e)(1).

"With regard to the facts of the circumstance, it took place in a public park at night. The defendant, Mr. Webb, chose to participate with two associates in the attack on the victim in this matter.

30.

"The prior convictions of Mr. Webb are numerous. He has served a prior prison term. His prior performance on probation or parole was unsatisfactory.

"And in considering factors in mitigation, I do not find mitigating factors as to the history or activity of Mr. Webb. He has a prior record of criminal conduct which is significant.

"His prior performance on probation or parole was unsatisfactory. He has not expressed a willingness to comply with probation. There appear to be indications that he would be able to comply; his inability to comply indicated by his lack of stable housing, lack of education, lack of employment, and drug use. And the defendant would be considered a danger to the community if not imprisoned."

The court sentenced Webb to an aggregate term of 16 years based on the upper term of four years for assault with a deadly weapon, doubled to eight years as the second strike sentence; plus consecutive terms of three years for the great bodily injury enhancement and five years for the prior serious felony conviction.

## III. Defendants' Sentences Must be Vacated and Remanded for Resentencing

In their supplemental briefs, defendants argue their sentences must be vacated and their cases remanded for resentencing. They contend the trial court improperly imposed upper terms for assault with a deadly weapon based on aggravating circumstances that were neither stipulated to by the defendants nor found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. Senate Bill 567, which amended section 1170, subdivision (b), requires such findings. Because the errors were not harmless beyond a reasonable doubt, resentencing is required. The People agree.

We review the relevant statutes and decisions from the United States and California Supreme Courts.

### A. *Senate Bill 567.*

Effective January 1, 2022, Senate Bill 567 amended section 1170, subdivision (b) "to prohibit imposition of an upper term sentence unless aggravating circumstances justify that term and the facts underlying any such circumstance, other than a prior conviction, 'have been stipulated to by the defendant or have been found true beyond a

31.

reasonable doubt at trial by the jury or by the judge in a court trial.' [Citation.] Allegations of prior convictions may be tried by the court alone and proven by certified records of conviction. [Citation.]" (*Lynch, supra*, 16 Cal.5th at p. 742.)

This amendment "applies retroactively to defendants … whose judgments were not final on direct appeal at the time the statute took effect." (*Lynch, supra*, 16 Cal.5th at pp. 742, 748–749.) "The plain language of section 1170[, subdivision] (b)'s current version now requires that, excepting prior convictions and in the absence of a waiver or stipulation, aggravating facts relied upon to justify an upper term must be resolved by the jury beyond a reasonable doubt." (*Id*. at p. 755.)

"In sum, a defendant is entitled to a jury trial on all aggravating facts, other than the bare fact of a prior conviction and its elements, that expose the defendant to imposition of a sentence more serious than the statutorily provided midterm. The proper procedure for adjudicating such aggravating facts is as follows: Defendants may assert the right to a jury trial, may waive jury in favor of a court trial, or may waive trial altogether. Subject to the standard rules of evidence both parties may stipulate to the admission of probation reports or other evidence bearing on a defendant's social and educational history, as well as other information relevant to sentencing, including criminal history. The burden is on the People to prove beyond a reasonable doubt the facts relied on to justify an upper term sentence. If those facts are properly proven, the court may take them into account and exercise its discretion under section 1170[, subdivision] (b) to determine what sentence to impose, keeping in mind the statutory limits on upward departures from the midterm and the requirement for stating its reasons on the record. [Citation.]" (*Wiley, supra,* 17 Cal.5th at p. 1086, fn. omitted.)

### B.     *Erlinger*.

In *Erlinger,* the United States Supreme Court addressed the federal Armed Career Criminal Act of 1984 (18 U.S.C. § 924(e)), which "imposes lengthy mandatory prison terms on certain defendants who have previously committed three violent felonies or serious drug offenses on separate occasions." (*Erlinger, supra*, 602 U.S. at p. 825.)

*Erlinger* held a judge may not "decide that a defendant's past offenses were committed on separate occasions under a preponderance-of-the-evidence standard," and held "the Fifth and Sixth Amendments require a unanimous jury to make that determination beyond a reasonable doubt." (*Id*. at pp. 825, 828, 849.)

"Virtually 'any fact' that ' "increase[s] the prescribed range of penalties to which a criminal defendant is exposed" ' must be resolved by a unanimous jury beyond a reasonable doubt (or freely admitted in a guilty plea). [Citations.] Judges may not assume the jury's factfinding function for themselves, let alone purport to perform it using a mere preponderance-of-the-evidence standard. To hold otherwise … would intrude on a power the Fifth and Sixth Amendments reserve to the American people." (*Erlinger, supra*, 602 U.S. at pp. 834–835.)

In reaching this conclusion, *Erlinger* considered the scope of the jury trial guarantee discussed in *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, and the prior conviction exception recognized in *Almendarez-Torres v. United States* (1998) 523 U.S. 224. (*Erlinger, supra*, 602 U.S. at pp. 836–837.) *Erlinger* explained the court had previously "delimited [the] reach" of *Almendarez-Torres*, which "persists as a 'narrow exception' permitting judges to find only 'the fact of a prior of a prior conviction.' [Citation.] Under that exception, a judge may 'do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of.' [Citation.]" (*Erlinger,* at p. 838.) *Erlinger* rejected the argument that the prior conviction exception "permits a judge to find perhaps any fact related to a defendant's past offenses." (*Id*. at p. 837.)

C. *Lynch and Wiley*.

In *Lynch*, the California Supreme Court relied on *Erlinger* and addressed the standard of prejudice when a trial court erroneously imposed an upper term without complying with the amended version of section 1170, subdivision (b)—where the aggravating circumstances were not stipulated to by the defendant, or were not found true

beyond a reasonable doubt at trial by the jury or by the judge in a court trial. (*Lynch, supra*, 16 Cal.5th at p. 742.)

*Lynch* held "a court reviewing a case where the former version of section 1170[, subdivision] (b) was employed must apply the *Chapman* standard of review" and "[a] prejudice inquiry under *Watson* is inadequate to assess the effect of a failure to honor the Sixth Amendment's jury trial right." (*Lynch, supra*, 16 Cal.5th at pp. 742, 760–761.)

*Lynch* held that under the amended version of section 1170, subdivision (b), "a Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established. The violation is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements. If the reviewing court cannot so determine, applying the *Chapman* standard of review, the defendant is entitled to a remand for resentencing." (*Lynch, supra*, 16 Cal.5th at p. 768.)

*Lynch* further held that since Senate Bill 567 amendments to section 1170, subdivision (b) "altered the scope of the trial court's discretion," a defendant's sentence must be vacated and the matter remanded for resentencing unless the record "clearly indicate[s] that the court would have found an upper term justified had it been aware of its more limited discretion." (*Lynch*, *supra*, 16 Cal.5th at p. 743.)

*Lynch* explained that when applying the "clearly indicates" standard, " 'it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers at the time of sentencing.' " (*Lynch, supra*, 16 Cal.5th at p. 776.) " '[M]ere reliance on the length of the original sentence and attendant decisions, such as imposing consecutive sentences, imposing middle or upper term sentences, or declining to strike enhancements, is not sufficient to provide a clear indication of what a sentencing court might do on remand if it had been fully aware of the scope of its discretionary powers.' [Citation.] In other words, it would

34.

be 'speculative' [citation] to conclude the trial court's finding that an upper term sentence was 'appropriate' in the exercise of its broad discretion, clearly indicates that it would have found aggravating circumstances sufficiently weighty to 'justify' an upward departure from the legislative mandate for no more than a middle term sentence." (*Id.* at p. 777.)

*Lynch* concluded remand for resentencing is generally required unless the sentencing court makes "the kind of definitive statements … to clearly indicate it would not impose a lesser sentence under any circumstances," or it " 'announce[d] that it is aware of forthcoming legislation and then explain[ed] how it would exercise its discretion under that legislation.' " (*Lynch, supra*, 16 Cal.5th at p. 777.)

In *Wiley*, the California Supreme Court addressed another section 1170, subdivision (b)(2) case, again relied on *Erlinger*, and held the trial court violated the defendant's "federal constitutional right to a jury trial by adjudicating underlying facts related to his prior convictions and improperly relying on its conclusions in choosing to impose an upper term sentence." (*Wiley, supra*, 17 Cal.5th at p. 1076.)

"Although *Erlinger* involved a different sentencing consideration, its analysis of the federal Constitution's jury trial right requires that a jury determine whether the particular details of a defendant's criminal history establish an unsatisfactory probation performance or demonstrate convictions of increasing seriousness, before a trial court can rely on those facts to justify an upper term sentence." (*Wiley, supra*, 17 Cal.5th at p. 1078.) "*Erlinger* requires us to overrule our decisions in *People v. Towne* (2008) 44 Cal.4th 63 … and *People v. Black* (2007) 41 Cal.4th 799 …, which construed the *Almendarez-Torres* prior conviction exception more broadly than *Erlinger* now allows." (*Id.* at p. 1076.)

The trial court in *Wiley* imposed the upper term by citing the defendant's " 'prior convictions, [his] poor performance on probation, and the fact that the charges are becoming more serious.' " (*Wiley, supra*, 17 Cal.5th at p. 1077, fn. omitted.)

*Wiley* held that determining a defendant's prior convictions to be increasingly serious surpassed "the bare fact of a prior conviction" and "requires a comparison and evaluation of the relationship among a defendant's prior convictions, and a determination as to their relative seriousness. As a result, it involves something more than a narrow factual finding that the convictions were sustained and what elements were required to prove them." (*Wiley, supra*, 17 Cal.5th at pp. 1084, 1082.) The trial court's finding was not harmless under *Chapman* because even though evidence of defendant's prior convictions "may have been sufficient to support a finding of increasing seriousness, that is not the proper inquiry when assessing prejudice under *Chapman*. [Citation.] Instead, we must ask 'whether any rational fact finder could have come to the *opposite* conclusion.' [Citation.] A rational juror could have reached the opposite conclusion here based on the totality of [the defendant's] criminal conduct and the applicable sentences for those transgressions. Accordingly, we cannot conclude beyond a reasonable doubt that a properly instructed jury would have found [the defendant's] criminal convictions were of increasing seriousness." (*Id*. at p. 1090.)

*Wiley* reached the same conclusion regarding the trial court's additional finding that the defendant's prior performance on probation was poor, based on a probation report that was introduced into evidence without objection. (*Wiley, supra*, 17 Cal.5th at pp. 1090–1091.) "[T]he probation officer's assessment in this case demonstrates that the record is also open to a different interpretation. She characterized [the defendant's] mixed performance on probation as *both* an aggravating factor *and* a mitigating factor. Given this assessment, we cannot discount the possibility that either counsel in a contested jury trial might have presented live testimony on this factor that would have affected the jury's determination. [Citation.] Nor can we discount the possibility that a rational jury could have disagreed as to whether the People had proved that [the defendant's] *overall performance* on probation was unsatisfactory. Accordingly, we cannot conclude the deprivation of a jury trial was harmless beyond a reasonable doubt." (*Id*. at p. 1091, fn. omitted.)

**D.** *Analysis.*

In their supplemental briefs, defendants argue that remand for resentencing is required under *Erlinger*, *Lynch*, and *Webb*, because the trial court imposed the upper terms for assault with a deadly weapon based on aggravating factors that defendants did not admit and were not found true by a jury beyond a reasonable doubt. The People agree that the errors were not harmless beyond a reasonable doubt because the record does not clearly indicate that the trial court would have imposed the same sentences under the amended version section 1170, subdivision (b).

The trial court conducted the sentencing hearings for both Luna and Webb in January 2021, and defendants' appeals were not yet final when Senate Bill 567 became effective on January 1, 2022. As a result, the amendments to section 1170, subdivision (b) are retroactive to their cases, so that the trial court could only impose an upper term if aggravating circumstances were stipulated to by defendants or found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial.

The trial court separately sentenced Luna and Webb, but it found the same aggravating circumstances to support the upper term for assault with a deadly weapon: their prior convictions were numerous, they had significant records of criminal conduct, and their prior performances on probation and parole was unsatisfactory. Defendants did not stipulate to their aggravating circumstances, and they were not found true beyond a reasonable doubt by the jury or by the judge in a court trial.

As in *Wiley*, we cannot conclude beyond a reasonable doubt that a jury would have found true the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements. The record does not clearly indicate the court would have found an upper term justified had it been aware of its more limited discretion, and the

37.

sentences for both Luna and Webb must be vacated and their matters remanded for resentencing.**7**

## **DISPOSITION**

The sentences of defendants Luna and Webb are vacated, and their cases are remanded for full resentencing in conformity with section 1170, subdivision (b), as amended by Senate Bill 567. The People may elect to retry the aggravating facts on remand or proceed to resentencing. In all other respects, the judgment is affirmed.

---

**7** Since Webb is entitled to a full resentencing hearing, we need not address Webb's additional appellate contentions that the trial court improperly imposed a fine of $890 without enumerating the individual components of that fine, and the trial court erroneously calculated his credits. Webb may raise both issues at the resentencing hearing, to the extent the issues become relevant.